STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2020 CU 0873

JOSEPH AIAVOLASITI KOTT

VERSUS

ASHLEY KOTT

Judgment Rendered: **APR 1 6 2021**

* * * * *

On Appeal from the
22nd Judicial District Court
Parish of St. Tammany, State of Louisiana
No. 2014-10050

The Honorable August J. Hand, Judge Presiding

* * * * *

David R. Paddison
Covington, Louisiana

Counsel for Defendant/Appellant,
Ashley Kott


Zara Zeringue
Covington, Louisiana

Counsel for Plaintiff/Appellee,
Joseph Aiavolasiti Kott

* * * * *

BEFORE: THERIOT, WOLFE, AND HESTER, JJ.

**WOLFE, J.**

In this child custody and child support dispute, the mother appeals the trial court's judgment modifying child custody, denying her request for increased child support, and ordering her to reimburse the father certain amounts. We amend the judgment and, as amended, affirm.

## FACTS

Ashley Kott and Joseph Aiavolasiti Kott married in 2011, separated in 2014, and were thereafter divorced. They are the parents of one child, O.K., born April 2, 2011. For the four years following their separation, the parties agreed to exercise joint, shared custody on a 2-2-3 schedule.[1] By further agreement, Joseph paid Ashley $350.00 in monthly child support.

Following the parties' separation, Joseph, a recovering alcoholic, suffered a relapse and was arrested for DWI and battery of a police officer. The charges were resolved in April 2017, when Joseph pled guilty to DWI and a misdemeanor count of resisting an officer. In 2018, Joseph was again arrested after causing a disturbance at the home of a friend that Ashley and O.K. were visiting, then engaging in a physical altercation with police officers (the 2018 incident). Following the 2018 incident, Ashley was granted a temporary restraining order, which ordered Joseph to stay away from Ashley and awarded Ashley temporary custody of O.K. During this time, Joseph sought treatment, which resulted in him being diagnosed with bipolar disorder and alcohol abuse disorder with sustained remission.

On February 5, 2018, the parties entered into a consent judgment that awarded Ashley sole and exclusive custody of O.K., named Ashley the domiciliary parent,

---

[1] A written judgment reflecting the agreement is not contained in the record on appeal; however, in written reasons for judgment the trial court indicated the consent judgment was signed June 4, 2014, while the case was before Division K, one of the court's two Family Court divisions. The parties have likewise referenced the consent judgment and do not dispute that this was their agreement. Other pleadings are also missing from the appellate record but are not dispositive of the issues on appeal. Since the parties do not dispute the filings, we describe them generally to provide the procedural history that led to the judgment at issue.

2

and provided that Joseph would have no visitation with O.K. The judgment provided for the possibility of visitation at a future date but required Joseph to produce medical records sufficient to determine his mental status and fitness prior to commencement of any visitation, whether supervised or unsupervised. The judgment provided that if Ashley disagreed that the medical records demonstrated Joseph's fitness to exercise visitation, she had the right to request an evaluation by a court-appointed mental health evaluator at Joseph's expense. Pursuant to the consent judgment and by agreement of the parties, the trial court issued a protective order, which required that Joseph continue to receive treatment as recommended and that Joseph provide medical records to Ashley at her request.[2]

Until March 2018, Joseph was a practicing attorney. Joseph self-reported his misconduct to the Office of Disciplinary Counsel and faced formal charges arising from his 2014 arrest and 2017 conviction. See In re Kott, 2020-00918 (La. 9/23/20), ___ So.3d ___ (2020 WL 5652209). Following his 2018 arrest, Joseph was transferred to disability inactive status. On June 29, 2018, Joseph signed a monitoring agreement with Louisiana's Judges and Lawyers Assistance Program (JLAP), which provides counseling and intervention services for judges, lawyers, and members of the legal community suffering from health, or drug or alcohol abuse issues. See La. R.S. 37:221. In accordance with JLAP's requirements, Joseph engaged in continued therapy and mental health treatment and began taking prescription medications.

In May 2018, Joseph filed a rule to reestablish visitation with O.K. and modify custody. Ashley opposed Joseph's requests and filed a rule for contempt based on Joseph's refusal to produce JLAP medical records in contravention of the consent judgment and protective order that required him to produce medical records to

---

[2] In May 2018, Joseph filed a petition to nullify both the consent judgment and protective order, alleging he lacked the required mental capacity at the time they were entered and also that he acted under duress; however, Joseph later filed a motion to dismiss the petition.

3

determine his mental fitness for visitation. After a hearing, the trial court held Joseph in contempt and ordered him to pay attorney's fees and costs of the proceedings. Joseph appealed, arguing JLAP records are confidential and privileged. This court found that according to the terms of the consent judgment, Joseph's failure to produce his medical records would result in the denial of visitation and, since he was not awarded visitation, Joseph did not violate the court order. Accordingly, this court reversed the finding of contempt and the awards of attorney's fees and costs, and ordered Ashley to pay the costs of the appeal. **Kott v. Kott**, 2018-1639 (La. App. 1st Cir. 4/12/19) (unpublished), 2019 WL 1589739, *5. Joseph thereafter filed a motion for the trial court to determine the amount of the costs and to compel return of the amount he paid as the contempt fine.

While the appeal to this court was pending, the presiding judge recused and the case was re-allotted to another division of the court.[3] On his own motion, the new presiding judge appointed Dr. Kristen Luscher to conduct a custody evaluation and ordered that the costs of the evaluation be equally divided among the parties. In the meantime, Joseph produced the disputed JLAP records.

After his visitation was halted in February 2018, Joseph had no contact with O.K. until he was permitted to write her a Christmas card that was given to O.K. by her therapist in January 2019. Thereafter, the trial court allowed Joseph increasing interactions with O.K., first through electronic communication, then through FaceTime calls during therapy sessions, then through in-person visitation supervised by a therapist, then through visitation supervised by Joseph's family members that increased over time from hours in length to overnight visits. When the visitation commenced, the trial court issued reciprocal preliminary injunctions prohibiting contact between the parties and ordering that they refrain from harassing the other

---

[3] This was the second Family Court judge to recuse; therefore, the case was allotted to a general jurisdiction division of the court.

4

or going to the other's residence or place of employment. The trial court also issued an interim order that provisionally granted Ashley's rule to increase child support, ordering Joseph to pay her $500.00 per month pending a final child support determination at the scheduled hearing. The order specified that the increase would begin in October 2019.

In January 2020, Joseph was tried for the criminal charges that stemmed from the 2018 incident and was convicted of resisting a police officer with force or violence, battery of a police officer, and simple criminal trespass. He was sentenced to three years and sixty days imprisonment. The three-year term was suspended, and Joseph was given credit for time served, with thirty days to be served in the parish jail, beginning March 23, 2020. The sentence further provided that, upon his release, he would be placed on supervised probation with special conditions, including compliance with the "stay away order" in place for Ashley and continued active JLAP participation.

A hearing on the pending child custody and child support issues was held days after the criminal sentence was imposed. The trial court determined that Joseph satisfied his burden of proving that a modification of custody was warranted. The trial court then awarded the parties joint, shared custody, to be exercised according to a schedule that began with Joseph having custody every other weekend and one night during the week. During the summer, the parties were ordered to transition to alternating weeks of physical custody with the non-custodial parent having O.K. one night during the other parent's week. Ashley was designated the domiciliary parent and Joseph was ordered to exercise physical custody at his parents' home, although the custody was not required to be supervised. The trial court ordered the parties to utilize the program Our Family Wizard to communicate about O.K. A parenting coordinator was appointed to resolve disputes for the entire term of Joseph's probation in the criminal proceeding. Custody exchanges were ordered to be

5

accomplished through a third party based on communication through Our Family Wizard. The trial court stated that use of the parenting coordinator and Our Family Wizard would allow co-parenting that is not in violation of the mutual injunctions entered in this custody matter or the stay away order entered in the criminal case. Joseph was also ordered to remain compliant with his medical and mental health treatments, including JLAP's requirements, and a previously issued court order regarding notification remained in place.

After determining the parties' incomes and calculating their child support obligations, the trial court denied Ashley's rule to increase child support and ordered that the original stipulated judgment ordering Joseph pay Ashley $350.00 in monthly child support remain in effect. Accordingly, the trial court vacated the interim order that provisionally increased Joseph's child support obligation. The trial court further ordered Ashley to pay Joseph $5,898.32, representing the amount of the contempt fine paid by Joseph, the costs of the previous appeal, and one-half the amount of the custody evaluation.

Ashley now appeals.

## CHILD CUSTODY

Ashley contends the trial court erred in awarding shared custody in this case where the stay away order in the criminal proceeding and mutual injunctions in this proceeding prohibit communication between the parents. She argues the trial court further erred in failing to implement enhanced provisions to allow her to verify Joseph's compliance with his mental health treatment and prescription medication requirements. Ashley further contends the trial court failed to consider the child's best interest in ordering implementation of the custody schedule and that she should be awarded sole custody.

Each child custody case must be viewed in light of its own particular set of facts and circumstances, with the paramount consideration being the best interest of

the child. See La. Civ. Code art. 131; **McCormic v. Rider**, 2009-2584 (La. 2/12/10), 27 So.3d 277, 279. In determining whether a proposed modification is in the best interest of a child, La. Civ. Code art. 134(A) enumerates the following non-exclusive factors to be considered by the court:

(1)    The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.

(2)    The love, affection, and other emotional ties between each party and the child.

(3)    The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(4)    The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(5)    The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6)    The permanence, as a family unit, of the existing or proposed custodial home or homes.

(7)    The moral fitness of each party, insofar as it affects the welfare of the child.

(8)    The history of substance abuse, violence, or criminal activity of any party.

(9)    The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10)    The home, school, and community history of the child.

(11)    The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12)    The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13)    The distance between the respective residences of the parties.

(14)   The responsibility for the care and rearing of the child previously exercised by each party.

The trial court is in the best position to ascertain the best interests of the child given the unique set of circumstances. Accordingly, the trial court's determination of custody is entitled to great weight and will not be reversed on appeal unless an abuse of discretion is clearly shown. **Moore v. Moore**, 2018-1713 (La. App. 1st Cir. 5/1/19), 276 So.3d 1063, 1067-68.

A trial court's determination of a child's best interests is usually based heavily on factual findings. **Babcock v. Martin**, 2019-0326 (La. App. 1st Cir. 10/24/19), 289 So.3d 606, 611. It is well settled that an appellate court cannot set aside a trial court's factual findings in the absence of manifest error or unless the findings are clearly wrong. **Rosell v. ESCO**, 549 So.2d 840, 844 (La. 1989). If the trial court's findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse those findings even though convinced it would have weighed the evidence differently had it been the trier of fact. **Id.** In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record clearly establishes that the fact finder is clearly wrong or manifestly erroneous. **Stobart v. State, Department of Transportation and Development**, 617 So.2d 880, 882 (La. 1993).

Where there is conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. **Id.** Further, when presented with two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. **Id.** at 883. Where the fact finder's conclusions are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so

heavily on the listener's understanding and belief in what is said. **Rosell**, 549 So.2d at 844.

The trial court is not required to give any extra credence to the testimony of experts. **Givens v. Givens**, 2010-0680 (La. App. 1st Cir. 12/22/10), 53 So.3d 720, 729. Expert testimony is to be weighed the same as any other evidence, meaning the effect and weight to be given expert testimony is within the trial court's broad discretion. Thus, the fact finder may accept or reject in whole or in part the opinion expressed by an expert. **Babcock**, 289 So.3d at 612.

The trial court's thorough and well-written reasons for judgment establish that in modifying custody, the trial court carefully considered O.K.'s best interests. Joseph's mental health and criminal history were significant concerns. The trial court placed great weight on Dr. Luscher's comprehensive custody evaluation, which described her findings as to each of the factors set forth in La. Civ. Code art. 134, and her recommendation that the parties return to equally sharing physical custody under certain conditions. The trial court also indicated it was impressed with Dr. Luscher's in-court expert testimony, during which each of the parties questioned her about her evaluations and conclusions.[4] After reviewing all of the evidence, including evidence from mental health treatment providers, the trial court agreed with Dr. Luscher's conclusion that Joseph's condition was effectively managed through medication and therapy, that Joseph was strictly compliant with JLAP's requirements, and that Joseph was able to co-parent O.K.

At trial, Ashley testified that she agreed with Dr. Luscher's recommendation as long as it did not violate the stay away order. She maintained that she was afraid of Joseph and did not want any direct contact with him. She raises this concern again on appeal, arguing that under the circumstances of this case, including mutual

---

[4]     Dr. Luscher testified as an expert in the field of clinical psychology.

injunctions and a stay away order that preclude contact between the parties, the trial court erred in awarding joint shared custody as it did. However, the trial court went to great lengths to direct the parties to communicate through My Family Wizard and the parenting coordinator, stating that doing so would not violate the injunctions or stay away order. The trial court further explained that the sentencing judge in the criminal proceeding was aware of this custody proceeding and that child exchange issues had previously been worked out with third party participation. Accordingly, we find no merit to Ashley's argument that the injunctions and stay away order preclude joint shared custody.

The topics of Joseph's mental health and potential for relapse were addressed throughout the hearing, with Ashley arguing that there should be a mechanism for her to verify that Joseph remains compliant with treatment and poses no danger to O.K. Mr. J.E. "Buddy" Stockwell, III, executive director of JLAP, provided detailed testimony regarding the JLAP program, its standards, and the supervision of its participants.[5] He described Joseph's obligations pursuant to his JLAP contract, Joseph's compliance with the program, and Joseph's resulting stability.[6] Mr. Stockwell clarified that if JLAP noticed something clinically wrong during its monitoring, it would notify the court. He also affirmed that JLAP would remain involved even if Joseph was later disbarred.[7]

---

[5] Although Joseph voluntarily produced the JLAP records that were introduced into evidence and discussed at the hearing, in deference to the confidential and privileged nature of JLAP proceedings, we do not discuss the details of the JLAP treatment herein, stating only that all evidence has been thoroughly reviewed. See La. R.S. 37:221.

[6] In addition to testifying at the March 2020 hearing, Mr. Stockwell testified on these subjects at prior hearings in this case. At the March 2020 hearing, the trial court admitted all evidence admitted at prior hearings.

[7] After the trial court rendered the judgment before us on appeal, the Louisiana Supreme Court granted Joseph's request for permanent resignation in lieu of discipline and ordered that he be permanently prohibited from practicing law and permanently prohibited from seeking readmission to practice law in Louisiana or any other jurisdiction. **In re Kott**, 2020-00918 (La. 9/23/20), ___ So.3d ___ (2020 WL 5652209).

10

Dr. Luscher testified that based on Mr. Stockwell's representations and her own familiarity with JLAP's requirements, there was "a high level of monitoring" in this case with multiple levels of accountability. She acknowledged that Joseph's compliance could not be guaranteed, but stated that there were more safeguards in place here than in other cases involving "everyday clients." Dr. Luscher felt assured that Joseph could remain stable under his treatment plan and that it was safe to allow him to exercise unsupervised custody. Dr. Luscher noted that many people with mental health issues raise children and that the facts of this case are that O.K.'s father has a treatable mental health condition.

In its reasons for judgment, the trial court explicitly addressed Ashley's concerns and reiterated that Joseph must remain compliant with his current psychiatric treatment and mental health counseling and follow the recommendations of his treatment providers and JLAP's requirements. The trial court maintained its order that JLAP provide notification of changes in Joseph's mental health status. The trial court further urged Ashley to obtain education and counseling through JLAP to better understand Joseph's mental health issues and ameliorate the ill effects his mental health crisis caused her.

After carefully reviewing the entire record in this case, we cannot conclude that the trial court manifestly erred in its factual findings or abused its discretion in awarding joint, shared custody, according to the schedule provided.

Ashley makes a further argument about the timing of Joseph's jail term being delayed due to the COVID-19 pandemic, the effect that had on implementing the custody arrangement, and the distress that caused O.K. As an appellate court, our judgment must be rendered upon the record on appeal. La. Code Civ. P. art. 2164. An appellate court has no authority to consider on appeal facts referred to in briefs that are outside the record. See **Gillio v. Hanover Am. Ins. Co.**, 2016-0640 (La. App. 1st Cir. 1/31/17), 212 So.3d 588, 591 n.3, writ denied, 2017-0393 (La.

11

4/24/17), 219 So.3d 1098. Since the facts Ashley references are not contained in the record on appeal, we do not consider this argument.

## CHILD SUPPORT

The trial court denied Ashley's rule to increase child support. On appeal, Ashley contends the trial court erred in failing to find that Joseph was grossly and intentionally underemployed, and in failing to impute more income to him for purposes of calculating his child support obligation.

An award of child support may be modified if the circumstances of the child or of either parent materially change. La. Civ. Code art. 142. Specifically, "[a]n award for support shall not be modified unless the party seeking the modification shows a material change in circumstances of one of the parties between the time of the previous award and the time of the rule for modification of the award." La. R.S. 9:311A(1). What constitutes a change in circumstances is determined on a case-by-case basis and falls within the great discretion of the trial court. **Folse v. Folse,** 2001-0946 (La. App. 1st Cir. 5/10/02), 818 So.2d 923, 925. Thus, on appeal, a trial court's child support judgment will not be reversed except for abuse of discretion. However, on appellate review, the trial court's factual findings are subject to the manifest error, clearly wrong standard of review. **Harang v. Ponder,** 2009-2182 (La. App. 1st Cir. 3/26/10), 36 So.3d 954, 967, writ denied, 2010-0926 (La. 5/19/10), 36 So.3d 219.

In general, the obligation parents owe to support their children is based on their gross incomes. See La. R.S. 9:315.2A. However, if a party is voluntarily unemployed or underemployed, child support must be calculated based on a determination of the party's income earning potential (rather than actual gross income), unless the party is physically or mentally incapacitated, or is caring for a child of the parties under the age of five years. See La. R.S. 9:315C(5)(a); La. R.S. 9:315.11. A party shall not be deemed voluntarily unemployed or

12

underemployed if he or she is absolutely unemployable or incapable of being employed, or if the unemployment or underemployment results through no fault or neglect of the party. La. R.S. 9:315C(5)(b).

Voluntary unemployment or underemployment for purposes of calculating child support is a question of good faith on the obligor-spouse. **Romanowski v. Romanowski**, 2003-0124 (La. App. 1st Cir. 2/23/04), 873 So.2d 656, 660. In virtually every case where a parent's voluntary unemployment or underemployment was found to be in good faith, courts have recognized extenuating circumstances beyond that parent's control which influenced or necessitated the voluntary change in employment. **Id.** Whether a party is in good faith in ending or reducing his income is a factual determination that will not be disturbed absent manifest error. **Lowe v. Bacon**, 2018-1549 (La. App. 1st Cir. 2/28/18) (unpublished), 2019 WL 1007105, *2.

Joseph testified that he has a degree in economics, was a licensed attorney, and has a real estate license. While Joseph guessed that his annual salary may at one time have been $100,000.00 through his law firm, he testified that he transferred to disability inactive status in March 2018 and is therefore prohibited from working in the legal field. Joseph explained that he had not consistently earned money in real estate and, in addition to facing disciplinary action related to his law license, was subject to disciplinary action by the real estate licensing board. He testified he has had trouble finding work, considering his felony conviction and the time required for his treatments. At the time of trial, Joseph worked approximately twenty to twenty-five hours per week for a friend at a shipyard doing fiberglass work, earning $15.00 per hour. He described his expenses and explained that he lives with his parents "half the time," when he has custody of O.K. He further testified that his parents were assisting him by paying a portion of O.K.'s school tuition, loaning him

money, and paying his child support obligation. Joseph described his situation as hard for himself and those around him.

At trial, Ashley presented the testimony of Andrew Hoffman, who the court accepted as an expert in various fields, pertinently the calculation of income for child support purposes. Mr. Hoffman considered evidence of Joseph's past income and Joseph's potential income as a real estate agent or paralegal. He testified that in his expert opinion, Joseph should be paying Ashley between $687.00 and $982.00 in monthly child support. Mr. Hoffman indicated his opinion was based on calculations using Worksheet A, not Worksheet B, which is used for 50/50 custody arrangements.

In its written reasons, the trial court stated it found that Mr. Hoffman's analysis was flawed and unreliable for a variety of reasons, noting Mr. Hoffman's assumption regarding Joseph's ability to work as a paralegal was contrary to law. As with any other witness, the trial court was free to accept or reject, in whole or in part, the opinions expressed by the experts who testified at trial. **Ryan v. Zurich Am. Ins. Co.**, 2007-2312 (La. 7/1/08), 988 So.2d 214, 222. Based on its own assessment of the evidence, the trial court did not determine that Joseph was underemployed. The trial court found it inappropriate to attribute Joseph the income of a paralegal or a real estate agent's yearly salary. Instead, the trial court found that Joseph's monthly income was $3,082.00, based on earnings of $15.00 per hour, working 40 hours weekly. The trial court then determined that the shared obligation worksheet should be used to calculate child support, resulting in a child support obligation that was roughly even for each party. Thus, the trial court vacated the interim order that increased Joseph's child support obligation and denied Ashley's rule to increase child support. In the absence of a rule to reduce child support filed by Joseph, the trial court found the stipulated judgment of child support, which obligated Joseph to pay Ashley $350.00 monthly, remained in effect.

The trial court's factual findings regarding Joseph's income were based heavily on credibility determinations. Thus, the manifest error standard demands that we accord great deference to the trial court. See **Rosell**, 549 So.2d at 844. After careful review, we find the trial court's determination of Joseph's income is reasonably supported by the record. The trial court did not err in its determinations regarding the parties' child support obligations and in denying Ashley's rule to increase child support.

Ashley additionally challenges the trial court's decision not to make the provisional increase in child support, set forth in the interim order of September 26, 2019, retroactive to the date of judicial demand. Ashley points out that the interim order specified that it was entered without prejudice to the issue of retroactivity. She maintains that she had sole custody during the entire time period, thus, the provisional award should be made retroactive.

The custody and support judgment that is the subject of this appeal vacated the interim order that provisionally increased child support. A vacated judgment is of no force or effect; thus, when a judgment is vacated, the parties return to the same positions they held before the judgment was rendered. **Reggio v. Reggio**, 2014-493 (La. App. 5th Cir. 12/16/14), 166 So.3d 290, 295, writ denied, 2015-0099 (La. 4/2/15), 163 So.3d 798. Ashley has not challenged the portion of the trial court's judgment that vacated the interim order; therefore, the interim order is without effect and cannot be made retroactive as Ashley requests.

### REIMBURSEMENT

Ashley challenges the provision of the trial court's judgment that ordered her to pay Joseph $5,898.32, with interest from the date of judgment, as reimbursement for amounts that included one-half the custody evaluation fee, the contempt fine paid by Joseph, and appeal costs that Ashley was ordered to pay in this court's prior decision. Ashley argues that she should not bear any costs of the custody evaluation

15

as it was necessary solely due to Joseph's actions. Moreover, she contends it was erroneous for the trial court to order her to reimburse Joseph for one-half the cost when the evidence demonstrates that Joseph's father paid that portion of the fee. Finally, she contends the amount determined to be the costs of the prior appeal improperly includes the cost Joseph incurred in filing a writ application with this court.

The trial court has great discretion in awarding costs, including expert witness fees, deposition costs, exhibit costs, and related expenses. La. Code Civ. P. art. 1920; La. R.S. 13:3666; La. R.S. 13:4533; **Arnaud v. Scottsdale Ins. Co.**, 2015-0185 (La. App. 1st Cir. 9/18/15), 181 So.3d 759, 761. While the general rule is that the party cast in judgment should be assessed with court costs, the trial court may assess costs in any equitable manner and against any party in any proportion it deems just, even against the party prevailing on the merits. See La. Code Civ. P. art. 1920; **Arnaud**, 181 So.3d at 761-62. The specific rule regarding the cost of custody evaluations is set forth in La. R.S. 9:331, which pertinently provides:

> A.    The court may order an evaluation of a party or the child in a custody or visitation proceeding for good cause shown. The evaluation shall be made by a mental health professional selected by the parties or by the court. The court may render judgment for costs of the evaluation, or any part thereof, against any party or parties, as it may consider equitable.

After reviewing the entire record in this proceeding, we find that the trial court abused its discretion in ordering Ashley to pay one-half the cost of the custody evaluation. This custody dispute is entirely attributable to Joseph's behavior and mental health crisis. Further, Joseph entered into a consent judgment and agreed to a protective order that obligated him to provide Ashley with medical records that he thereafter resisted providing. The consent judgment further provided that if Ashley was not satisfied that the records established his fitness to exercise visitation, Ashley had the right to request a court-appointed mental health evaluation *at Joseph's*

*expense.* In fact, Ashley requested a mental health evaluation at Joseph's expense before the trial court acted on its own motion to order the evaluation by Dr. Luscher. Under these circumstances, the entire cost of the custody evaluation must be borne by Joseph.

The reimbursement amount additionally included the costs of the prior appeal in this matter, which this court assessed to Ashley. See **Kott**, 2019 WL 1589739 at *5. In addition to a statement from the Clerk of Court for the 22nd Judicial District Court that itemized the costs of that appeal, Joseph submitted the affidavit of his attorney's employee who attested that she paid "appeal costs" totaling $285.00 to file a writ application and related documents. Although referred to in the affidavit as appeal costs, we find that the $285.00 payment related to a writ application that Joseph filed, which was numbered 2018CW0856. See **Kott v. Kott**, 2018-0856 (La. App. 1st Cir. 7/24/18) (unpublished writ action), 2018 WL 3559930. This court did not assess those costs to Ashley in rendering our prior decision; therefore, the trial court erred in including them as appeal costs in calculating the amount of reimbursement Ashley owes.

For these reasons, we amend the trial court's judgment to reduce the amount of Ashley's reimbursement obligation from $5,898.32 to $2,613.32, which reflects the amount of court costs associated with the prior appeal and the amount Joseph paid pursuant to the contempt judgment that this court reversed.

## CONCLUSION

For the reasons set forth herein, the May 5, 2020 judgment of the trial court is amended to reduce to $2,613.32 the amount that Ashley Kott must pay Joseph Kott as reimbursement. As amended, the judgment of the trial court is affirmed. Costs of this appeal are assessed equally to Joseph Aiavolasiti Kott and Ashley Kott.

**AMENDED AND, AS AMENDED, AFFIRMED.**